UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                              Case No. 15-cr-20095
                                                HON. MARK A. GOLDSMITH

MICHAEL PAUL FARNSWORTH,

    Defendant.
_____/

**OPINION & ORDER**
**DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS (Dkt. 53)**

This matter is before the Court on Defendant Michael Paul Farnsworth's motion to suppress statements (Dkt. 53). The issues have been fully briefed, and hearings were held on May 12, 2017 and May 16, 2017. Defendant argues that statements he made during and after a polygraph examination were obtained in violation of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). For the reasons stated below, the Court denies Farnsworth's motion.

### I. BACKGROUND

In January 2015, FBI Special Agent Raymond Nichols, a member of the Southeast Michigan Trafficking and Exploitation Crimes Task Force ("SEMTEC"), began an undercover investigation into individuals trafficking in child pornography. 5/12/2017 Hr'g Tr. at 8 (Dkt. 59). Using a law enforcement database, Nichols identified an individual located in Michigan suspected of possessing child pornography. Id. at 9. Nichols determined that the individual was using Gigatribe, a type of peer-to-peer software, to possess and share the pornography. Id.

To use Gigatribe, users must create both a username and password. Id. at 10. Each account includes a folder, into which users are able to download files. Users are then able to send friend requests to others on the software. Id. at 10-11. However, a friend request alone is not sufficient

1

to access the files contained within another's personal folder; to access the contents, the other user must provide his password. Id. at 11. Oftentimes, users will exchange passwords so that each one is able to view the contents of the other's folder. Id.

Nichols began the operation by sending a friend request to an individual, who went by the username "NancyDell." Id. at 12. After the friend request was accepted, Nichols then asked for the password to NancyDell's private folder. Id. Once Nichols received the password, he opened the folder to find files containing child pornography. Id.

Nichols determined that the NancyDell account was being used from a home located on Oxford Street in Woodhaven, Michigan, and subsequently obtained a search warrant for the home on the basis of his findings on Gigatribe. Id. at 13. Nichols and several other members of the SEMTEC arrived at the home at approximately 6:00 a.m. on February 11, 2015. Id. at 14. After the agents failed to receive an answer at the door, Nichols ordered that the door be broken down. Id. at 16. The agents then entered the home and encountered Farnsworth to the right of the front door. Id. Farnsworth testified that, upon entering the home, an agent shined a flashlight at him and pointed a gun in his face. Id. at 150. Farnsworth was then put in handcuffs while the agents conducted a protective sweep of the home. Id. at 18.

After the sweep was conducted, Nichols approached Farnsworth and informed him that the agents had a search warrant and asked if he would agree to be interviewed. Id. at 22. After Farnsworth agreed, Nichols asked him if he was going to run. Id. at 152. When Farnsworth responded that he would not, Nichols took off the handcuffs and walked with Farnsworth and Special Agent Adam Christensen to the laundry room of the home so that they could speak in private. Id.

While Nichols testified that Farnsworth was not under arrest at this point, he handed Farnsworth a form entitled "advice of rights," which set forth Farnsworth's Miranda rights. Id. at 26. Nichols testified that, despite his belief that Farnsworth was not under arrest, he felt it was

appropriate to inform Farnsworth of his Miranda rights because Farnsworth was "temporarily detained." Id. Nichols then had Farnsworth read the advice of rights form. Id. at 28. After Farnsworth finished, Nichols asked him if he understood his rights, to which Farnsworth responded that he did. Id. Nichols then had Farnsworth sign the portion of the form entitled "consent." Id.

Nichols began a thirty-to-forty minute interview with Farnsworth, during which time Farnsworth admitted that he was NancyDell and that he used the account to download child pornography. Id. at 29. Farnsworth also admitted using other peer-to-peer software in order to download child pornography. Id. at 29-30. Although Farnsworth told the agents that there were 100 pictures of child pornography on his computer, agents later discovered over 8,000 such pictures. Id. at 189.

When asked if children ever visited the home, Farnsworth stated that his daughter and his brother's four children would often stay over. Id. at 31. Farnsworth denied ever engaging in sexual activity with them or other minors. Id. at 31. Nichols testified that Farnsworth never asked to stop the interview or to speak to an attorney, nor did he indicate a lack of understanding of his rights. Id. at 31-32. Farnsworth did inform Nichols that he had taken Percocet the night before to manage back pain. Id. at 70.

To ensure that Farnsworth was being truthful regarding sexual contact with minors, Nichols asked him if he would be willing to take a polygraph examination, to which Farnsworth responded that he would. Id. at 34. Prior to heading to the Federal Building in Detroit to undergo the examination, Farnsworth ate and used the bathroom, during which time he was shadowed by Christensen. Id. at 158. Farnsworth then proceeded to get into Nichols's vehicle and drive to Detroit. Id. at 37. While they were on their way to the polygraph, Farnsworth asked Nichols if he was going to be placed under arrest. Id. at 35. Nichols replied that he was unsure, but that Farnsworth was not under arrest at that time. Id. Farnsworth testified at one point that he was informed by Christensen that he would be free to go home if he passed. Id. at 161. However,
3

Farnsworth subsequently testified that there were no promises made about what would happen to him if he took the polygraph. Id. at 197. Nichols also testified that no such promises were made. Id. at 38.

Upon arriving at the Federal Building, Nichols and Christensen escorted Farnsworth to an elevator that took them to the FBI office. Id. at 40. It was there that they met Special Agent Michael Fitzgerald, the individual responsible for conducting the polygraph examination. Id. at 41. Fitzgerald and Nichols then placed Farnsworth in the examination room and stepped outside to discuss the scope of the examination. Id. Nichols informed Fitzgerald of Farnsworth's admissions at the home and requested that the polygraph focus on whether Farnsworth had engaged in sexual contact with minors. Id. Fitzgerald testified that the room Farnsworth was left in did not lock. Id. at 85.

Nichols and Fitzgerald then reentered the examination room. Fitzgerald informed Farnsworth of his Miranda rights and provided him with another advice of rights form and a polygraph consent form. Id. Farnsworth read his rights and was asked by Fitzgerald if he understood his rights. Id. at 88-89. After Farnsworth responded that he did, he signed both forms. Id. at 90. Nichols then left the room and obtained an arrest warrant and criminal complaint based on Farnsworth's statements at the home. Id. at 45.

After Nichols left the room, Fitzgerald began his questioning of Farnsworth. Fitzgerald's questioning consisted of three stages: (i) the pre-test interview; (ii) the polygraph examination; and (iii) the post-test interview. Fitzgerald's pre-test interview with Farnsworth lasted an hour and forty-five minutes, during which time Fitzgerald received Farnsworth's biographical information, including his criminal record, employment history, level of education, and his health. Id. at 97-100. Farnsworth stated that he dropped out of high school in the twelfth grade and received his GED online in 2012. Id. at 93-94. Farnsworth did not indicate during the pre-test that he had a diminished capacity to understand the matters before him. Id. at 95.

4

After the pre-test concluded, Fitzgerald placed the polygraph components on Farnsworth and began the examination. Id. at 100. After questioning Farnsworth regarding whether he ever had sexual contact with a minor, Fitzgerald observed that the results were inconclusive. Id. at 101. Fitzgerald then began a second round of questioning, again asking Farnsworth whether he had ever engaged in sexual contact with a minor. Id. The results of this examination indicated that Farnsworth was being deceptive. Id.

Fitzgerald then removed the polygraph components and began the post-test interview. Id. After being informed that he had failed the polygraph examination, Farnsworth admitted that, when he was approximately twenty-two years old, he had a sexual relationship with a fifteen year old. Id. Farnsworth denied that he ever engaged in sexual contact with any other minors, including those who resided at his home in Woodhaven. Id. at 103. Fitzgerald then offered Farnsworth the opportunity to make a written statement, which Farnsworth accepted. Id. After Farnsworth finished his statement, Fitzgerald brought Nichols back into the room and read him the contents of the statement. Id. at 106-107. Upon Nichols's request, Farnsworth agreed to allow Nichols to assume the identity of NancyDell in order to identify others trafficking in child pornography. Id. at 108. Nichols then placed Farnsworth under arrest. Id.

Farnsworth testified regarding his education level, stating that he received special education from kindergarten until the ninth grade, and struggled after he was placed in regular classes, ultimately dropping out in the twelfth grade. Id. at 143. He stated that he did not understand the advice of rights form he signed prior to his interview with Nichols. Id. at 163. He also testified that he was "scared at the moment" he signed the advice of rights and polygraph consent forms when he was with Fitzgerald and Nichols, and that he did not grasp what he had signed until after he had signed the documents. Id. at 168. He also testified that he often has difficulty comprehending what he reads, an issue that dates back to his childhood. Id. at 171. Despite this, he did not voice concerns to any of the agents. Id. at 168.

Regarding his written statement, Farnsworth testified that Fitzgerald suggested that writing a statement would result in a lenient sentence if he were convicted. Id. at 176. He also testified that Fitzgerald told him what he should write, including about his relationship with the fifteen year old and the possession of child pornography. Id. at 177. Fitzgerald denied telling Farnsworth what to write and informed him that he did not have to make a written statement. Id. at 105.

## II. ANALYSIS

Farnsworth now moves to suppress the oral and written statements made during and following his polygraph examination at the FBI office. He argues that he did not voluntarily, knowingly, and intelligently waive his Miranda rights by signing the second advice of rights form and the polygraph consent form. Farnsworth also argues that his confession following the polygraph, that he had sex with a minor, was the product of coercion and deception. He states that he agreed to the interview after it was implied by the agents that he may not be arrested that day if he agreed to take the polygraph.

The Government argues that Farnsworth was never in custody and that, as a result, he was not entitled to his Miranda rights. Even if he was in custody, the Government argues that Farnsworth voluntarily, knowingly, and intelligently waived his Miranda rights. Finally, the Government argues that Farnsworth's confession was not coerced because he was not promised anything regarding whether he would be arrested if he took the polygraph.

Under the Fifth Amendment, a defendant cannot be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "In Miranda, the Supreme Court determined that a suspect under custodial interrogation must be given notice of his Fifth Amendment right against self-incrimination." United States v. Malcolm, 435 F. App'x 417, 420 (6th Cir. 2011) (citing Miranda 384 U.S. at 478-479). "To ensure compliance with this rule, incriminating statements elicited during custodial interrogation prior to Miranda warnings cannot be admitted at trial." Id. (citing Stansbury v. California, 511 U.S. 318, 322 (1994)).

Whether an individual is in custody, and thus entitled to Miranda rights prior to interrogation, depends on "how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984). "The first factor considered is whether a reasonable person in defendant's situation 'would have believed that [he] was free to terminate the interrogation and leave." Malcolm, 435 F. App'x at 420-421 (quoting United States v. Crossley, 224 F.3d 847, 861 (6th Cir. 2000)). Courts also consider the location of the interview, the length and manner of the interview, whether there was restraint on the individual's freedom to move, and whether the individual was informed that he did not need to answer the questions. See United States v. Hinojosa, 606 F.3d 875, 883 (6th Cir. 2010).

A review of the record demonstrates that a reasonable person in Farnsworth's position would have understood himself to be in continuous custody from the time the search warrant was executed through the end of the questioning at the FBI office. Upon entering the home to execute the search warrant, agents placed Farnsworth in handcuffs. While this was understandably done for safety purposes during a protective sweep, the handcuffs were only removed after Nichols received Farnsworth's assurance that he would not run if the handcuffs were taken off. Farnsworth also provided unrebutted testimony that Christensen shadowed his every move following the laundry room interview, going so far as to accompany him to the bathroom. After agreeing to the polygraph, Farnsworth was then transported in Nichols's vehicle to the FBI office, where he was escorted by Nichols and Christensen to the examination room. While the door to the room was never locked, it appears that either Nichols or Fitzgerald were in the room or just on the other side of the door at all times. Further, Nichols testified that as Fitzgerald was beginning the pre-examination interview, Nichols left to go obtain an arrest warrant.

The Government relies on Nichols's and Fitzgerald's statements to Farnsworth that he was not under arrest, noting the Sixth Circuit's ruling in United States v. Swanson, 341 F.3d 524 (6th Cir. 2003). In Swanson, officers arrived at a tattoo parlor to arrest a man for firearm trafficking.

7

After clearing out the parlor, an officer stopped the defendant as he attempted to walk away and questioned him without reading him his Miranda rights. The court ultimately found that the defendant was not in custody at the time of questioning. In weighing the custodial factors, the court stated that "[m]ost important to our analysis . . . is that Swanson was explicitly told by [the officer] that he was not under arrest and that he did not have so [sic] speak with him if he did not choose to." Id. at 530.

While Nichols and Fitzgerald did assure Farnsworth that he was not under arrest, Swanson is distinguishable in a number of respects. Unlike in Swanson, the questioning of Farnsworth did not take place "outside, in a public space, with other agents and at least seven or eight other people . . . nearby." Id. at 529.[1] The length of questioning here, three hours, seems considerably longer than the questioning in Swanson, which "only lasted as long as the time that it took to clear Swanson's name through the [law enforcement database]." Id. at 530 (also describing the questioning as "not a prolonged interrogation"). Further, the court in Swanson noted that the defendant was never in handcuffs and "was not arrested at the conclusion of the interview." Id. Farnsworth was handcuffed, albeit for safety reasons, and he was arrested upon the conclusion of his interview with Fitzgerald. All of this leads the Court to conclude that Farnsworth was in custody at the time of the questioning at the FBI office.

The Court must next consider whether Farnsworth properly waived his Miranda rights. Out of an abundance of caution, perhaps sensing that a court would view their questioning of Farnsworth as a form of custodial interrogation, the agents informed Farnsworth of his Miranda rights on two occasions. Nichols provided Farnsworth with the first advice of rights form prior to the laundry room interview, which Farnsworth signed after informing Nichols that he understood

---

[1] While the court in Swanson recognized other cases in which defendants were found not to be in custody when they were interrogated at police stations, the location of the interview in this case, when considered in conjunction with the other custodial factors, leads the Court to believe that Farnsworth was in custody while he was questioned at the FBI office.

8

his rights. Farnsworth also received a second advice of rights, and a polygraph consent form, just prior to his pre-test interview at the FBI office. Farnsworth also signed these forms after indicating his understanding of his Miranda rights. Farnsworth now argues this second waiver of his Miranda rights was not made knowingly, intelligently, and voluntarily, and that his subsequent confession to sexual contact with a minor was the product of coercion and deception.

"To be valid, waivers of Fifth Amendment rights must be 'voluntarily, knowingly and intelligently' made." United States v. Montgomery, 621 F.3d 568, 573 (6th Cir. 2010) (quoting Miranda, 384 U.S. at 444). "The inquiry as to whether there was a valid waiver has two components." United States v. Wilkerson, 76 F. App'x 657, 660 (6th Cir. 2003). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id. Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. "The ultimate question is 'whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." Holland v. Rivard, 9 F. Supp. 3d 773, 787 (E.D. Mich. 2014), aff'd, 800 F.3d 224 (6th Cir. 2015) (quoting Miller v. Fenton, 474 U.S. 104, 112 (1985). "The government bears the burden of proving, by a preponderance of the evidence, that Miranda rights were voluntarily and knowingly waived." United States v. Binford, 818 F.3d 261, 273 (6th Cir. 2016).

Farnsworth claims that his Miranda rights were not waived voluntarily because he was promised that he would not be arrested if he agreed to take the polygraph. There are three requirements for finding that a defendant's confession was involuntary: (i) the police activity was objectively coercive; (ii) the coercion was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the motivating factor in the defendant's decision to make the confession. United States v. Miggins, 302 F.3d 384, 397 (6th Cir. 2002).

Farnsworth argues that the conduct of Nichols and Christensen was objectively coercive because they led him to believe that he would not be arrested if he agreed to take the polygraph. In support of this contention, Farnsworth notes that, on the way to the FBI office, he asked Nichols if he would be arrested, to which Nichols responded "I don't know, you're not under arrest right now." 5/12/2017 Hr'g Tr. at 35. While it is true that "a promise of . . . immediate release may be so attractive as to render a confession involuntary," United States v. Simon, 512 F. App'x 465, 467 (6th Cir. 2013), Nichols's statement that he did not know if Farnsworth would be arrested can hardly qualify as a promise of immediate release. While Farnsworth attempts to characterize this statement as an inducement to take the polygraph in exchange for being released, a more plausible interpretation is that, before speaking with federal prosecutors, Nichols legitimately did not know whether Farnsworth would be placed under arrest that day. See 5/12/2017 Hr'g Tr. at 44 ("At the end of the day it was the United States Attorney's Office decision.").

Farnsworth also claims that Christensen told him, in response to his question of whether he would be arrested, that he would not be arrested as long as he took and passed the polygraph. However, this claim is contradicted by Farnsworth's own testimony that he was not promised anything in exchange for agreeing to take the polygraph. Id. at 197. This claim is also belied by Nichols's testimony that Farnsworth was never promised anything in exchange for agreeing to take the polygraph, which the Court credits. Id. at 38. Nichols was in the car when Christensen allegedly made the promise that Nichols would not be arrested if he passed the polygraph. Id. Such a promise would have directly contradicted the statement that had just been made by Nichols, the case agent, that the agents were unsure whether Farnsworth would ultimately be placed under arrest. Farnsworth's allegation is further contradicted by his own representations on the advice of rights and polygraph consent forms that he had not been promised anything in exchange for taking the polygraph. Because there is no credible evidence of objectively coercive police activity, the Court holds that Farnsworth's Miranda waiver was made voluntarily. See Colorado v. Connelly,

479 U.S. 157, 167 (1986) ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'. . . .").

The Court next turns to whether Farnsworth's waiver was made knowingly and intelligently. "To determine whether the confession was knowing and intelligent, we apply a totality of the circumstances test to ascertain whether [the defendant] understood his right to remain silent and to await counsel." Clark v. Mitchell, 425 F.3d 270, 283 (6th Cir. 2005). These circumstances include the defendant's "age, experience, education, background, and intelligence." Garner v. Mitchell, 557 F.3d 257, 261 (6th Cir. 2009). "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." Colorado v. Spring, 479 U.S. 564, 574 (1987). Rather, he need only understand that he can choose not to talk to the police, to talk only with counsel present, or to stop talking at any time. Id.

Farnsworth relies heavily on his lack of education to establish that he did not knowingly or intelligently waive his Miranda rights. He notes that he was in special education classes for most of his school years, and that he struggled when he was placed in regular classes. However, "[i]t is well-established, in this circuit and others, that mental capacity is one of many factors to be considered in the totality of the circumstances analysis regarding whether a Miranda waiver was knowing and intelligent." Garner, 557 F.3d at 264. As a result, "diminished mental capacity alone does not prevent a defendant from validly waiving his or her Miranda rights." Id.; see also Smith v. Mullin, 379 F.3d 919, 933 (the defendant's waiver was knowing and intelligent despite the fact that he suffered from borderline mental retardation).

In cases where a defendant with a diminished capacity was found to have not knowingly and intelligently waived his Miranda rights, there have been some other indicia to police that the defendant did not understand his rights. Garner, 557 F.3d at 265; see also United States v. Garibay, 143 F.3d. 534, 537-538 (9th Cir. 1998) (in addition to low IQ, the defendant primarily spoke

11

Spanish and thus could not understand his Miranda rights without a translator); Cooper v. Griffin, 455 F.2d 1142, 1144-1146 (5th Cir. 1972) (defendants did not waive Miranda rights where they had severe mental retardation and were minors).

There seemed to be no indicia to the agents here that Farnsworth did not understand his Miranda rights. It is uncontested that Farnsworth read both the advice of rights form and consent to polygraph form, and he informed the agents he understood his rights prior to signing. Further, Farnsworth's conduct leading up to the arrest indicated his understanding of the severity of the situation. See Garner, 557 F.3d at 262 (stating that a defendant's conduct leading up to arrest is to be considered in the Miranda analysis). Specifically, his attempts to minimize to the agents the amount of child pornography he possessed, as well as his attempts to deceive Fitzgerald during the polygraph, are "more consistent with a person attempting to avoid being caught than a person who did not know what he was doing." United States v. Turner, 157 F.3d 552 (8th Cir. 1998).

Finally, Farnsworth argues that "[a] person of normal intelligence would have no reason to think that post-exam interview/interrogation would follow the device testing or that they had consented to such a later interview/interrogation." Def. Mot. at 6 (Dkt. 53). Unfortunately for Farnsworth, the Supreme Court has expressly rejected this contention. In Wyrick v. Fields, 459 U.S. 42, 47 (1982), the Court held that the facts that "the polygraph examination had been discontinued, and [the defendant] was asked if he could explain the test's unfavorable results" did not require new Miranda warnings. That is precisely the situation the Court is faced with here. After the second set of questions indicated that Farnsworth was being deceptive, Fitzgerald took off the polygraph components and asked Farnsworth if he could explain the test results. As the Court in Wyrick observed, "[d]isconnecting the polygraph equipment effectuated no significant change in the character of the interrogation." Id.

All of the above leads the Court to conclude that Farnsworth's Miranda waiver was made voluntarily, knowingly, and intelligently.

Finally, Farnsworth contends that his confession of past sexual conduct with a minor was the product of police coercion. However, as noted above, there is no evidence of objectively coercive police activity. See United States v. Redditt, 87 F. App'x 440, 445 (6th Cir. 2003) ("The test for whether a Miranda waiver is voluntary is essentially the same as the test for whether a confession is voluntary."). There is also no credible evidence that Fitzgerald coerced Farnsworth into making his written statement. There is no allegation that Fitzgerald promised Farnsworth anything in exchange for making the written statement, or that he pressured him in any way. While Farnsworth contends that Fitzgerald essentially told him what to write, this is contradicted by Fitzgerald's testimony that he had no involvement whatsoever in the drafting of the statement. Fitzgerald's assertion that the written statement was of little importance to him is credible in light of Farnsworth's verbal confession. The Court also notes that the written statement is entirely consistent with Farnsworth's verbal admission, the contents of which Farnsworth does not deny. See 5/12/2017 Hr'g Tr. at 147.

As a result, Farnsworth's claim that his confession was coerced fails.

### III. CONCLUSION

For the above reasons, the Court denies Farnsworth's motion to suppress statements (Dkt. 53).

SO ORDERED.

| | |
|---|---|
| Dated: July 31, 2017<br>Detroit, Michigan | s/Mark A. Goldsmith<br>MARK A. GOLDSMITH<br>United States District Judge |

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 31, 2017.

s/Karri Sandusky<br>Case Manager